IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ELWOOD A. GREEN, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. GLR-20-2365 |
| ASSISTANT WARDEN JEFF NINES, et al., | * | |
| | * | |
| Defendants. | | |

\*\*\*

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants Asresahegn Getachew, M.D., Holly Hoover, N.P., and William Beeman's ("Medical Defendants") Motion to Dismiss or, Alternatively, for Summary Judgment (ECF Nos. 21, 22),[1] and Defendants Jeffrey Nines and Richard Roderick's ("Correctional Defendants")[2] Motion to Dismiss or, Alternatively, for Summary Judgment (ECF No. 27). The Motions are ripe for disposition, and no hearing

---

[1] Medical Defendants' dispositive motion appears to have been inadvertently docketed twice. (See ECF Nos. 21, 22). For simplicity, the Court will refer to ECF No. 21 as the operative Motion and will dismiss ECF No. 22 without prejudice as moot.

[2] Defendant Gregory Werner was not served with the Complaint and the Complaint against him will be dismissed for that reason. Even if Werner were served, the Court would dismiss the Complaint against him pursuant to 28 U.S.C. § 1915(a) for failure to state a claim. As set forth in more detail in Section II.B.2, infra, in a suit arising under 42 U.S.C. § 1983, the doctrine of respondeat superior generally does not apply and liability attaches only upon a defendant's personal participation in the constitutional violation. See Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985); Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004). The only allegation against Werner in the Complaint was that Werner served as Acting Warden during some portion of the events recounted in the Complaint. (See Compl. at 6, ECF No. 1).

is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2021). For the reasons set forth below, the Court

will grant the Motions.[3]

## I.   BACKGROUND[4]

### A.   <u>Plaintiff's Allegations</u>

Plaintiff Elwood Green states that on September 18, 2019, he suffered trauma as a

result of a heatstroke which, among other things, damaged his face and glass eye. (Compl.

at 8, ECF No. 1).[5] He complained through a sick call slip, a type of health services request,

---

[3] Green has filed a Motion for Leave to File an Amended Complaint (ECF No. 18), wherein he states that he has determined that Jeffrey Nines is not an appropriate Defendant and wishes that he be "dropped from suit to reflect the 'responsible party.'" (Mot. Leave File Am. Compl. at 1, ECF No. 18). The Court will grant the uncontested Motion and dismiss the Complaint as to Defendant Nines.

Also pending are State Defendants' Motion for Extension of Time to Respond to the Complaint (ECF No. 20) and Green's Motion for Extension of Time to file his Opposition (ECF No. 26). The Court will grant both Motions <u>nunc pro tunc</u>.

Medical Defendants have filed a Motion to Strike (ECF No. 32) Green's "Objection and Response" (ECF No. 31) to Medical Defendants' Motion to Dismiss or, Alternatively, for Summary Judgment (ECF No. 21). The docket incorrectly identifies Green's filing as an Opposition to Correctional Defendants' dispositive motion; in fact, it is an unauthorized surreply responding to Medical Defendants' dispositive Motion and Reply. As this Court does not permit surreplies absent Court approval—and as Green has failed to explain why the surreply is necessary—the Court will grant the Motion to Strike.

Finally, Green has filed an "Order for [Cause] for [a] Preliminary Injunction" (ECF No. 6), which the Court construes as a Motion for a Preliminary Injunction. For the reasons set forth in Section II.B.3, <u>infra</u>, the Court will deny the Motion. Green also filed a "Motion to Object to Defendants' Motion to Deny Court Issuing Temporary Restraining Order" (ECF No. 17), which the Court construes as a Reply in support of his Motion and will otherwise deny.

[4] Unless otherwise noted, the Court takes the following facts from Green's Complaint and accepts them as true. See <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (citations omitted).

[5] Citations to page numbers refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

and filed Administrative Remedy Procedure ("ARP") requests stating that he suffered facial pain, eye lobe irritation, and damage to his prosthetic eye. (Id.). After several months, Defendant Asresahegn Getachew, M.D., met with him via video conference. (Id.). Green explained that he suffered pain in his face and eye lobe and could not wear his prosthetic eye. (Id.). Getachew prescribed Tegretol, which Green began to receive on December 12, 2019. (Id.).

Green continued to experience pain and submit sick call requests. (Id.). On December 23, 2019, a physician in the optometry department saw Green and advised him that they would only prescribe eyeglasses and that there was nothing they could do but refer him to the ophthalmology department, warning that it could be months before his appointment. (Id.).

On January 22, 2020, a physician in the ophthalmology department evaluated Green and stated that Green's prosthetic eye was intact but damaged and would need to be "re-buffed" to make it smooth again. (Id. at 9.). The doctor further advised that he would contact Getachew regarding Green's continued complaint of eye pain. (Id.).

Green continued to suffer pain in his eye and continued to submit sick call slips. (Id.). On March 30, 2020, Green spoke with a nurse named Brittany ("Nurse Brittany") regarding the pain in his inner eye lobe and his inability to place his prosthetic eye into the socket due to pain, swelling, and bleeding on the inner eye lobe caused by damage to the prosthetic. (Id.). He submitted a sick call slip that day but did not receive a visit. (Id.). The following day, he held his feed slot open and demanded to see someone from the medical department due to severe pain in his eye, swelling, and slow bleeding. (Id.). Defendant

Holly Hoover, N.P., came to see Green at his cell. She acknowledged that he was bleeding from cuts to his inner eye lobe and had swelling in his face but told him that there was nothing she could do and left. (Id.).

For the next several months, Green continued to complain of pain in his eye, bleeding from his eye lobe, and pain in his face. (Id.). On June 4, 2020, he spoke with Nurse Brittany about the swelling and bleeding, and she provided him Bacitracin and gauze. (Id.).

On June 16, 2020, Green yelled out of his window and begged Hoover and Defendant William Beeman, the Assistant Director of Nursing, to see him. (Id.). When Beeman came to his cell door, Green showed him the cut inside of his inner eye lobe and the damage to his prosthetic, explaining that the issue predated the COVID-19 pandemic. (Id.). He advised Beeman that Hoover ignored him every time he called her to his cell. (Id.). He further informed Beeman that he was in pain due to his inability to walk around without his prosthetic in place. (Id.).

## B.    **Correctional Defendants' Response**

Correctional Defendants aver that they did not interfere with, delay, or hinder Green's receipt of medical care. (Nines Decl. ¶ 5, ECF No. 27-2; Roderick Decl. ¶ 5, ECF No. 27-3). They explain that medical services are provided to inmates at North Branch Correctional Institution ("NBCI"), the correctional facility where the matters at issue occurred, by private medical contractors and that they do not have any personal involvement with the provision of medical care to any inmate. (Nines Decl. ¶ 2; Roderick Decl. ¶ 2). Correctional Defendants state that they do not have the authority to order medical staff to perform a particular procedure or render a particular treatment. (Nines

Decl. ¶ 2; Roderick Decl. ¶ 2). Correctional Defendants add that when responding to inmates' complaints regarding medical care, they rely on the reports and judgments of medical staff. (Nines Decl. ¶ 4; Roderick Decl. ¶ 4).

## C.   <u>Medical Records</u>

Medical Defendants explain that Green has "a history of enucleation (removal of the eye that leaves the eye muscles and remaining orbital contents intact) of the left eye following trauma to the eye" and that, as a result, Green uses a prosthetic eye. (Decl. of Holly Hoover ["Hoover Decl."] ¶ 6, ECF No. 12-1; Green Medical Records ["Med. Rs."] at 4–5, 40, ECF No. 12-2).

On August 21, 2019, Green submitted a sick call complaining about pain in his face and left eye. (Med. Rs. at 53). On September 19, 2019, a nurse examined Green due to his complaints of left eye pain and noted scarring from an injury with slight dryness under his left eye and slight swelling. (<u>Id.</u> at 2–3). She referred Green to an optometrist and obtained a verbal order for ointment to address the dryness under the left eye. (<u>Id.</u>). At the time of the exam, Green had an active prescription for naproxen. (<u>Id.</u>). Green next complained of left eye pain via a sick call slip he submitted on November 23, 2019, in which he described pain on the left side of his face and in his eye. (<u>Id.</u> at 51). A note was made on the slip that refills of his medications were provided. (<u>Id.</u>).

Jaleh Daee, M.D., evaluated Green on December 11, 2019, for complaints of left eye pain. (<u>Id.</u> at 4–6). Green reported taking Tegretol, an anti-seizure medication also used to treat neuropathic pain, and used vitamin A & D ointment ("A&D ointment") for the skin around his left eye. (<u>Id.</u>). He asked for refills of those medications. (<u>Id.</u>). Daee observed no

infection or conjunctivitis but noted that the skin around Green's eye was dry. (Id.). Daee renewed Green's prescriptions for artificial tears, eye lubricant, Tegretol, and A&D ointment. (Id.). Five days later, on December 16, 2019, Hoover requested eye lubricant and an ointment composed of lanolin, mineral oil, and petrolatum (the "lanolin ointment"). (Hoover Decl. ¶ 9; Med. Rs. at 7). Getachew approved the request. (Hoover Decl. ¶ 9).

Green submitted sick call slips on December 17, 20, and 25, 2019, complaining of eye pain and asking to see an optometrist about his prosthetic being cracked.[6] (Id. at 46–48). An optometrist evaluated Green on December 23, 2019. (Med. Rs. at 39). Green reported a crack or scratch on his prosthetic eye that caused pain. (Id.). The optometrist noted dryness in the periorbital area but did not observe any swelling, infection, or bleeding of Green's left eye socket. (Id.). He referred Green to an ophthalmologist. (Id.).

The ophthalmologist evaluated Green on January 22, 2020, and Green reported pain in his left eye. (Id. at 40). The ophthalmologist did not observe swelling, infection, or bleeding of Green's left eye socket. (Id.). The doctor noted that she would request polishing of the prosthesis. (Id.). Getachew does not recall any conversation with an ophthalmologist regarding Green. (Decl. of Asresahegn Getachew ["Getachew Decl."] ¶ 8, ECF No. 21-6). On January 28, 2020, the ophthalmologist requested an ocularist appointment so that Green's prosthesis could be polished. (Med. Rs. at 11–12).

---

[6] It appears that Green mistakenly wrote a date of December 20, 2021 on a call slip which the Department of Public Safety and Correctional Services received on December 21, 2019. (Med. Rs. at 47). The Court assumes that the correct date for the call slip is December 20, 2019.

Michael Klepitch, R.N., saw Green on January 30, 2020, due to his complaint of back pain. (Id. at 13). Green also complained of eye pain from his prosthetic eye. (Id.). Klepitch noted that Green claimed his back brace was confiscated when he was transferred to NBCI, but there was no active authorization for a back brace. (Id.). He also noted that Green had seen optometry two days earlier. (Id.). Green had active prescriptions for muscle rub, naproxen, eye lubricant, artificial tears, and Tegretol. (Id.). Klepitch referred Green to a provider. (Id.).

Hoover evaluated Green on February 25, 2020, at which time Green requested a back brace for exercise. (Id. at 18). Hoover advised Green that a back brace was not clinically indicated. (Id.). Green did not make any complaints regarding eye pain or exhibit any abnormalities of his eye. (Id.). Hoover ordered blood work. (Id. at 27). On March 4, 2020, Green's laboratory results showed Tegretol levels less than 2.0 ug/mL, indicating the medication was not detectable in Green's bloodstream and he was not taking the medication as prescribed. (Hoover Decl. ¶ 14; Med. Rs. at 83). Repeat blood work on March 13, 2020, also showed no detectable level of Tegretol. (Med. Rs. at 84).

On March 18, 2020, Hoover renewed Green's prescriptions for artificial tears and eye lubricant. (Id. at 19). On March 20, 2020, she requested Dextran 70-Hypromellose, a lubricant eye drop, and discontinued the Tegretol prescription due to Green's laboratory work demonstrating he had not taken the medication as prescribed. (Hoover Decl. ¶ 17; Med. Rs. at 20–22). Getachew approved the request for eye drops. (Id.). On March 31, 2020, Hoover submitted a new request for the lanolin ointment, which Getachew approved. (Hoover Decl. ¶ 18; Med. Rs. at 23–24).

Hoover received Green's sick call slip complaining of back, eye, and facial pain on May 5, 2020. (Id. at 26; Hoover Decl. ¶ 20). She responded to Green and advised him that medical staff had discontinued his Tegretol prescription because of the results of the blood work. (Id. at 25). Hoover prescribed naproxen for pain relief. (Id. at 25-26).

Beeman does not specifically recall the alleged interaction with Green on June 16, 2020. (Decl. of William Beeman ["Beeman Decl."] ¶ 6, ECF No. 21-4). He does recall that Green expressed medical complaints to him through his cell window. (Id.). Beeman explains, and Hoover confirms, that requesting medical treatment through the cell door is not the proper method for accessing medical care. (Id.; Hoover Decl. ¶ 19). Rather, inmates are required to submit health services requests, i.e., sick call slips, to the medical department. (Id.). Beeman and Hoover each explain that whenever Green complained to them through his cell door of his medical problems they would direct him to submit a sick call request. (Id.). Beeman further explains that he could not properly examine Green or render treatment at the cell door. (Beeman Decl. ¶ 6). Beeman avers that he did not ignore or disregard Green's medical needs but rather directed Green regarding the proper method for seeking medical care. (Id.).

On May 5, 2020, Hoover entered a chart note regarding Green's submitting sick calls regarding chronic back, eye, and facial pain. (Med. Rs. at 26). The note indicated that medical staff had discontinued Green's Tegretol prescription due to the results of the laboratory work and prescribed naproxen as an analgesic. (Id.). She further noted that Green was not seen on that date due to COVID-19 restrictions. (Id.).

8

On June 22, 2020, Erica Lindner, L.P.N., wrote in Green's chart that in January 2020, she attempted to schedule an appointment to have Green's prosthetic polished, but was unsuccessful, and added that the offices she contacted were unsure where to refer patients for such a service. (Id. at 9). She added a second note reflecting that earlier that month, she had unsuccessfully attempted to contact Dr. Simms-Green, the ophthalmologist who previously treated Green, for assistance in finding someone to polish the prosthetic. (Id.). Lindner also contacted the Regional Medical Director to advise that she had exhausted her resources to schedule the requested appointment. (Id.).

On July 16, 2020, Hoover saw Green through his cell door when he refused to come to the medical unit. (Id. at 28). She advised Green that the consultation for an ocularist was still pending. (Id.). He requested Tegretol and assured her he would take it as prescribed. (Id.). Hoover prescribed Tegretol, but warned Green that if he failed to submit to laboratory work or the lab results did not detect the medication, they would discontinue the prescription. (Id.).

On August 5, 2020, Lindner entered another note into Green's chart regarding her unsuccessful efforts, beginning in January 2020, to schedule an appointment for prosthetic polishing at various medical facilities in Maryland. (Id. at 10). She noted that the offices she contacted either no longer saw inmates or did not polish prosthetics. (Id.). The facility recommended by Dr. Simms-Green no longer saw inmates. (Id.). Linder further noted that she notified Hoover, Getachew, and Beeman that she had been unsuccessful scheduling the appointment. (Id.). While Hoover explains that she does not schedule appointments, the nurse kept Getachew and Beeman updated as to the status of the appointment. (Hoover

Decl. ¶ 23). Hoover avers that she does not supervise the administrative staff responsible for scheduling medical appointments and that neither Hoover nor any other Corizon staff have the ability to dictate the availability of an off-site medical provider. (Id. ¶ 3).

Hoover saw Green on August 7, 2020, due to his complaints of eye discomfort. (Med. Rs. at 32). He complained that his eye felt irritated all the time and requested an eye lubricant. (Id.). Hoover noted that Green's appointment with the ocularist was scheduled for the end of the month. (Id.). Green exhibited no eye abnormalities on examination. (Id.). Regardless, Hoover requested the eye lubricant, which Getachew approved. (Id. at 29–30). The ocularist evaluated Green on August 31, 2020, noted that the prosthesis had deteriorated, and recommended a new one. (Id. at 41). The ocularist did not note any swelling, bleeding, or infection in Green's eye socket. (Id.).

Hoover saw Green on October 1, 2020, as follow up to the ocularist appointment. (Hoover Decl. ¶ 27; Med. Rs. at 36–37). The ocularist requested two additional appointments. (Id.). At the time of the appointment with Hoover, Green did not complain of pain or any other ocular complication. (Id.). Hoover did not note any eye abnormalities. (Id.). Hoover avers that had Green voiced complaints regarding his eye or if she had observed bleeding, swelling, or infection, she would have noted those issues. (Hoover Decl. ¶ 27). Hoover requested two appointments with an the ocularist to paint Green's eye and for delivery of the prosthesis. (Med. Rs. at 34–35). At this time of this appointment, Green had an active prescription for Tegretol. (Id. at 36).

On October 20, 2020, a nurse provided Green with bacitracin, gauze, and tape. (Hoover Decl. ¶ 28; Med. Rs. at 43). Hoover avers that the nurse provided Green those

items due to his history of dryness in and outside of his eye socket. (Hoover Decl. ¶ 28). Hoover explained that the items were intended to keep the eye socket moist and to cover the eye socket when Green was not using his prosthesis. (Id.).

Green's laboratory tests showed subtherapeutic levels of Tegretol on September 16, 2020, and October 26, 2020. (Id. ¶¶ 26, 29; Med. Rs. at 88, 90). Hoover thus discontinued Green's Tegretol prescription on November 6, 2020. (Green Suppl. Medical Records ["Suppl. Rs."] at 2, 8–9, ECF No. 21-5).

On November 16, 2020, medical staff issued Green additional supplies. (Suppl. Rs. at 3). The following day, Green submitted a sick call request complaining of eye pain. (Id. at 10). Hoover wrote to Green on November 19, 2020, advising him that an appointment with the ocularist was pending. (Id. at 4–5). She further advised him that she had discontinued his Tegretol prescription because it laboratory results had once again failed to detect it in his system. (Id.). She advised Green that she had prescribed Tylenol for his complaints of pain and discomfort. (Id.). She noted that she was not able to see him on that date due to COVID-19 restrictions. (Id.). Getachew later prescribed the lanolin ointment for Green. (Id. at 6–7).

Hoover avers that she did not deny Green treatment of any medical concern or symptoms and did not disregard or ignore his medical needs. (Hoover Decl. ¶ 30). She further avers that she did not witness Beeman or any other medical provider deny Green necessary medical treatment. (Id.). Hoover further avers that she has never observed bleeding or open wounds in Green's left eye socket. (Id. ¶¶ 19, 31). Further, Green's

medical records do not reflect open wounds, infection, or bleeding from Green's left eye socket. (Id. ¶ 31).

Getachew did not personally see Green from September 19, 2019, to the filing of Medical Defendants' dispositive motion. (Getachew Decl. ¶ 14). Getachew was made aware of the issues regarding scheduling the off-site appointment but does not recall being made aware that Green complained of pain associated with his prosthetic eye. (Id.). Getachew explains that onsite medical providers addressed Green's complaints of pain. (Id.).

Hoover and Getachew each aver that in their opinion, Green was provided appropriate care for his medical conditions, including his ocular complaints. (Hoover Decl. ¶ 32; Getachew Decl. ¶ 15). Beeman explains that while NBCI has been locked down, Green has had access to medical care through the sick call process. (Beeman Decl. ¶ 13). At the time of filing their dispositive Motion, Green was scheduled for two appointments with the ocularist who previously examined him,[7] (Hoover Decl. ¶ 32; Beeman Decl. ¶ 15), and has been provided medical treatment for his complaints of pain. (Id.).

D.     **Procedural History**

Green, proceeding pro se, filed this lawsuit on August 14, 2020. (ECF No. 1). Green's two-count Complaint alleges that Defendants violated the Eighth and Fourteen Amendments to the United States Constitution by acting with deliberate indifference to his

---

[7] Green confirms that on September 22, 2020, the cracks were buffed out of the prosthetic and he received a new prosthetic on January 4, 2021. (Objection Mot. Dismiss Alt. Summ. J. ["Opp'n"] at 4, ECF No. 29).

serious medical needs. (Id. at 10). Green seeks compensatory and punitive damages and injunctive relief. (Id.).

On September 25, 2020, Green filed a "Order for [Cause] for [a] Preliminary Injunction" (ECF No. 6), which the Court construes as a Motion for a Preliminary Injunction, along with an "Affidavit in Support of Affiant Complaint" (ECF No. 7), which the Court construes as a supplement to the Complaint. In his Motion for Preliminary Injunction, Green does not add additional allegations, but clarifies his request for injunctive relief. Through the Motion, Green seeks treatment for his medical needs, a new glass eye, and referral to an optometrist trained to treat his condition. (Order Couse Prelim. Inj. ["PI Mot."] at 1–2, ECF No. 6). In his supplement to the Complaint, Green explains that he continued to suffer pain and bleeding in his eye, as well as headaches, and had not been able to access ARPs. (Aff. Supp. Affiant Compl. ["Compl. Suppl."] at 2, ECF No. 7).

On November 12, 2020, Medical Defendants responded to Green's Motion for Injunctive Relief. (ECF No. 12). Correctional Defendants responded on November 15, 2020, relying on the response filed by Medical Defendants. (ECF No. 14). On November 30, 2020, Green filed a "Motion to Object to Defendants' Motion to Deny Court Issuing Temporary Restraining Order" (ECF No. 17), which the Court construes as a Reply to Defendants' responses and will otherwise deny.

On December 21, 2020 and February 2, 2021, Medical and Correctional Defendants, respectively, filed Motions to Dismiss or, Alternatively, for Summary Judgment. (ECF Nos. 21, 27). Green filed an Opposition on March 24, 2021. (ECF No. 29). Medical Defendants filed a Reply on April 7, 2021 (ECF No. 30).

## II.   DISCUSSION

**A.   <u>Standard of Review</u>**

**1.   Conversion**

Defendants style their Motions as motions to dismiss under Rule 12(b)(6) or, in the alternative, for summary judgment under Rule 56. "A motion styled in this manner implicates the Court's discretion under Rule 12(d)[.]" <u>Pevia v. Hogan</u>, 443 F.Supp.3d 612, 625 (D.Md. 2020) (citation omitted). Rule 12(d) provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." <u>Wells-Bey v. Kopp</u>, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Charles Alan Wright & Arthur R. Miller, <u>Federal Practice & Procedure</u> § 1366, at 159 (3d ed. 2004)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and "a reasonable opportunity for discovery." <u>Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt.</u>, 721 F.3d 264, 281 (4th Cir. 2013) (citation omitted). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. <u>See</u> <u>Moret v. Harvey</u>,

381 F.Supp.2d 458, 464 (D.Md. 2005) (citing Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 260–61 (4th Cir. 1998)). The Court "does not have an obligation to notify parties of the obvious." Laughlin, 149 F.3d at 261.

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011) (citation omitted). Yet "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To successfully raise the need for additional discovery, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d). A Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery." Hamilton v. Mayor & City Council of Balt., 807 F.Supp.2d 331, 342 (D.Md. 2011) (citation omitted). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Ingle ex rel. Est. of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (quoting Strag v. Bd. of Trs., Craven Cmty. Coll., 55 F.3d 943, 954 (4th Cir. 1995)).

The Fourth Circuit has warned that it "'place[s] great weight on the Rule 56[d] affidavit' and that 'a reference to Rule 56[d] and the need for additional discovery in a

memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56[d] affidavit.'" <u>Harrods</u>, 302 F.3d at 244 (quoting <u>Evans</u>, 80 F.3d at 961). Failing to file a Rule 56(d) affidavit "is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." <u>Id.</u> (quoting <u>Evans</u>, 80 F.3d at 961). Despite these holdings, the Fourth Circuit has indicated that there are some limited circumstances in which summary judgment may be premature, notwithstanding the non-movants' failure to file a Rule 56(d) affidavit. <u>See</u> <u>Id.</u> A court may excuse the failure to file a Rule 56(d) affidavit when "fact-intensive issues, such as intent, are involved" and the nonmovant's objections to deciding summary judgment without discovery "serve[] as the functional equivalent of an affidavit." <u>Id.</u> at 244–45 (quoting <u>First Chi. Int'l v. United Exch. Co.</u>, 836 F.2d 1375, 1380 (D.C. Cir. 1988)).

Here, the Court concludes that both requirements for conversion are satisfied. Green was on notice that the Court might resolve the Motions under Rule 56 because Defendants styled their Motions in the alternative for summary judgment and presented extra-pleading material for the Court's consideration. <u>See</u> <u>Moret</u>, 381 F.Supp.2d at 464. In addition, the Clerk informed Green about the Motions and the need to file an opposition. (<u>See</u> Rule 12/56 Letters, ECF Nos. 23, 28). Green filed an Opposition but did not include a request for more time to conduct discovery. (<u>See</u> ECF No. 29). Accordingly, the Court will treat the Motions as motions for summary judgment and will consider documents outside of Green's Complaint in resolving Defendants' Motions.

### 2.    Summary Judgment

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing that there is a genuine dispute of material fact. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co., LLC v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citations omitted). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of his case where he has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

**B.   Analysis**

**1.   Denial of Medical Care**

Green alleges that Defendants failed to provide him adequate medical care after his prosthetic eye was damaged in violation of the Eighth Amendment of the United States Constitution. The Eighth Amendment proscribes "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. U.S. Const. amend. VIII; Gregg v. Georgia, 428 U.S. 153, 173 (1976). To sustain a claim for denial of medical care under the Eighth Amendment, a plaintiff must show that the defendant's acts or omissions were done with deliberate indifference to a serious medical need. See Estelle v.

Gamble, 429 U.S. 97, 106 (1976); see also Anderson v. Kingsley, 877 F.3d 539, 543 (4th

Cir. 2017).

Deliberate indifference to a serious medical need requires proof that, objectively,

the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the

prison staff were aware of the need for medical attention but failed to either provide it or

ensure it was available. See Farmer v. Brennan, 511 U.S. 825, 834–37 (1994); see

also Heyer v. U.S. Bureau of Prisons, 849 F.3d 202, 209–10 (4th Cir. 2017); King

v. Rubenstein, 825 F.3d 206, 218 (4th Cir. 2016); Iko v. Shreve, 535 F.3d 225, 241 (4th

Cir. 2008). Objectively, the medical condition at issue must be serious. See Hudson

v. McMillian, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided

with unqualified access to health care); accord Jackson v. Lightsey, 775 F.3d 170, 178 (4th

Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as

mandating treatment or one that is so obvious that even a lay person would easily recognize

the necessity for a doctor's attention.'" Heyer, 849 F.3d at 210 (quoting Iko, 535 F.3d at

241); see also Scinto v. Stansberry, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide

diabetic inmate with insulin where physician acknowledged it was required is evidence of

objectively serious medical need). Proof of an objectively serious medical condition,

however, does not end the inquiry.

After a serious medical need is established, a successful Eighth Amendment claim

requires proof that the defendant was subjectively reckless in treating or failing to treat the

serious medical condition. See Farmer, 511 U.S. at 839–40; see also Rich v. Bruce, 129

F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both

of the general risk, and also that the conduct is inappropriate in light of that risk."). Indeed, "[a]ctual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995) (quoting Farmer, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through other evidence that tends to establish the defendant knew about the problem. Scinto, 841 F.3d at 226. This includes evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id. (quoting Farmer, 511 U.S. at 842).

Mere negligence or malpractice does not rise to a constitutional level. Donlan v. Smith, 662 F.Supp. 352, 361 (D.Md. 1986) (citing Estelle, 429 at 106); see also Scinto, 841 F.3d at 225. "Deliberate indifference is 'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" (quoting Farmer, 511 U.S. at 835) (alteration in original); Russell v. Sheffer, 528 F.2d 318, 318–19 (4th Cir. 1975) ("[M]istreatment or non-treatment must be capable of characterization as 'cruel and unusual punishment' in order to present a colorable claim[.]" (citing Gittlemacker v. Prasse, 428 F.2d 1, 6 (3rd Cir. 1970)))

Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. See Lightsey, 775 F.3d at 179 (physician's act of prescribing treatment raises a fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless

exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). Additionally, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." United States v. Clawson, 650 F.3d 530, 538 (4th Cir. 2011) (quoting Bowring v. Godwin, 551 F.2d 44, 47–48 (4th Cir. 1977)).

The record before the Court demonstrates that Medical Defendants addressed Green's complaints regarding his eye.[8] Hoover and other medical providers prescribed naproxen, Tegretol, and Tylenol to address Green's complaints of pain. The record is also clear that Green did not take the Tegretol as prescribed and that medical staff discontinued the prescription due to his noncompliance. Additionally, Hoover and other medical providers prescribed Green eye lubricants and drops to keep his eye socket lubricated. An optometrist, ophthalmologist, and ocularist evaluated him regarding his prosthetic. While there was a delay in scheduling Green to see an ocularist, that delay was not attributable to any of the named Defendants, who were not responsible for scheduling off-site evaluations. Despite this, Hoover facilitated follow-up appointments with the ocularist, and while awaiting those appointments regularly prescribed analgesic pain medication.

Further, while Beeman and Hoover both agree that they would not provide treatment to Green at his cell door, they explain that proper treatment cannot be provided at the cell

---

[8] The records further demonstrate that Getachew did not evaluate or prescribe Tegretol to Green after September 18, 2019, when his complaints regarding eye pain arose. There is no evidence that Getachew was subjectively aware of Green's complaints of pain. (Beeman Decl. ¶ 14).

door and Green, as evidenced by his medical records, had access to medical treatment through the sick call process. Defendants properly directed him to use the established process for seeking medical care.

Green complains that due to the issue with this prosthetic, he had an open wound in his eye as well as an infection in and bleeding from the eye socket. Those claims, however, are not supported by the medical record. (Hoover Decl. ¶ 31; see generally Med. Rs., Suppl. Rs.). At no time has any medical provider—including the optometrist, ophthalmologist, or ocularist—noted in Green's medical records swelling, infection, or an open wound in Green's left eye socket. Moreover, while Green reports pain arising from the deficiency in his prosthetic, the medical record makes clear that he did not take his pain medication as prescribed. The record evidence all clearly rebuts the allegation that any of the named Defendants knew of and disregarded a serious risk to Green's health.

### 2. Fourteenth Amendment Claims

Green does not articulate the basis for his allegation that Defendants violated his Fourteenth Amendment rights. Liberally construing the Complaint, the Court presumes that Green intends to allege that Defendants violated his rights under the Due Process Clause by violating NBCI policies and procedures relating to providing medical care. Even if he were correct in that assertion, however, a mere violation of state law or regulation does not amount to a due process claim. See Riccio v. Cnty. of Fairfax, 907 F.2d 1459, 1469 (4th Cir. 1990) ("If state law grants more procedural rights than the Constitution would otherwise require, a state's failure to abide by that law is not a federal due process issue."); Clark v. Link, 855 F.2d 156, 163 (4th Cir. 1988) ("[A] section 1983 claim can

only be sustained by allegations and proof of a violation of the Constitution or statutes of the United States and specifically may not rest solely on a violation of state statutes or qualify as a common law tort."). Accordingly, Green's Fourteenth Amendment claim will be dismissed.

### 3.   Supervisory Liability

In a suit arising under 42 U.S.C. § 1983, the doctrine of respondeat superior generally does not apply and liability attaches only upon a defendant's personal participation in the constitutional violation. See Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985); see also Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004). Liability of supervisory officials "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001) (quoting Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984)). Thus, supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. See Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted).

Green does not allege any facts suggesting that Correctional Defendants were personally involved in or otherwise aware of the decisions regarding the provision of medical care to Green. To the contrary, Correctional Defendants aver that a private medical contractor is responsible for providing medical services to NBCI inmates; therefore, Correctional Defendants had no authority to make decisions or recommendations about medical care, order medical staff to render any treatment, or monitor the provision of medical services to inmates. Instead, when an inmate complained about medical care, Correctional Defendants "relied on the reports, assessments and judgments of the contractor's trained medical staff to prepare any response for [his] signature." (Nines Decl. ¶ 4; Roderick Decl. ¶ 4). For these reasons, Green has not established Correctional Defendants' supervisory liability, and Green's claims against Correctional Defendants must be dismissed.

### 4.    Injunctive Relief

A preliminary injunction is an extraordinary remedy. See Munaf v. Geren, 553 U.S. 674, 689–90 (2008) (citing 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice & Procedure § 2948, at 129 (2d ed. 1995)). A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) that the injunction is in the public interest. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); see also The Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346–47 (4th Cir. 2009). To demonstrate a likelihood of irreparable

harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." Direx Israel, Ltd. v. Breakthrough Med. Grp., 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. See Taylor v. Freeman, 34 F.3d 266, 269 (4th Cir. 1994).

As discussed, the record evidence viewed in the light most favorable to Green does not establish that Defendants violated his constitutional rights by denying or delaying medical treatment. The undisputed evidence before the Court establishes that Green is receiving regular care, including analgesic and prophylactic treatment, and referral to outside specialists. In all, there is no evidence that Defendants have been deliberately indifferent to his serious medical need. Green's claim for injunctive relief fails because he has not established a constitutional violation. Further, his claim is moot as he confirms that he has received a new prosthesis. Accordingly, the Court will deny Green's request for injunctive relief.

### III.   CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss or, in the Alternative, Motion for Summary Judgment will be granted. A separate Order follows.

Entered this 17th day of September, 2021.


_____
                    /s/
George L. Russell, III
United States District Judge